2023 IL App (4th) 200121

NOS. 4-20-0121, 4-20-0135, 4-20-0142, 4-20-0386, 4-20-0387, 4-20-0388 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 4, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE CARLE FOUNDATION, an Illinois Not-For-Profit Corporation, | ) ) | Appeal from the Circuit Court of |
|     Plaintiff-Appellee and Cross-Appellant, | ) | Champaign County |
|     v. | ) | No. 08L202 |
| THE DEPARTMENT OF REVENUE; BRIAN HAMER, in His Official Capacity as Director or Revenue; THE CHAMPAIGN COUNTY BOARD OF REVIEW; DIANE HAYS, ELIZABETH BURGENER-PATTON, and MARK WHITSETT, in Their Official Capacity as Members of the Champaign County Board of Review; STAN JENKINS, in His Official Capacity as Champaign County Supervisor of Assessments; CUNNINGHAM TOWNSHIP; DAN STEBBINS, in His Official Capacity as Cunningham Township Assessor; DANIEL J. WELCH, in His Official Capacity as Champaign County Treasurer; and THE CITY OF URBANA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
|     Defendants-Appellants and Cross-Appellees, | ) ) | |
| (Champaign County, Intervenor-Appellant and Cross-Appellee). | ) ) | Honorable Randall B. Rosenbaum, Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices Harris and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1 In its simplest sense, this case concerns a taxpayer's attempt to recover charitable use property tax exemptions, which it previously held but lost. Plaintiff, the Carle Foundation, brought this action to establish that four of its properties were exempt from real estate taxation for the years 2004 through 2011. The trial court found in favor of plaintiff and awarded exemptions (some partial and some full) for the years 2005 through 2011, but it denied plaintiff's exemption for the 2004 tax year. It further denied plaintiff's claim for breach of contract and its request for prejudgment interest. The court entered a final judgment on its prior December 4, 2018, order, entering summary judgment for defendants on count I, which claimed that various defendants had no authority to levy assessments on the four parcels in 2004.

¶ 2 The following defendants appeal the award of exemptions for 2005 through 2011: the Department of Revenue (Department); David Harris, in his official capacity as Director of Revenue; the Champaign County Board of Review; Elizabeth Burgener-Patton, Robert Zebe, and Paul Sailor, in their official capacity as members of the Champaign County Board of Review; Paula Bates, in her official capacity as Champaign County Supervisor of Assessments; Cassandra Johnson, in her official capacity as Champaign County Treasurer; Cunningham Township; Wayne T. Williams Jr., in his official capacity as Cunningham Township Assessor; the City Of Urbana; and intervenor Champaign County (collectively, defendants). We note that numerous officeholders have changed over since the filing of plaintiff's fourth amended complaint in 2014. David Harris succeeded Brian Hamer as Director of Revenue, Robert Zebe and Paul Sailor succeeded Dianne Hays and Mark Whitsett as Champaign County Board of Review members, Paula Bates succeeded Stan Jenkins as the Champaign County Supervisor of Assessments, Cassandra Johnson succeeded Daniel J. Welch as Champaign County Treasurer, and Wayne T. Williams Jr. succeeded Dan Stebbins as Cunningham Township Assessor.

¶ 3 Plaintiff cross-appeals the trial court's denial of exemptions for 2004, the entry of summary judgment on its claim of unauthorized termination of exemptions (count I), and the denial of prejudgment interest.

¶ 4 For the reasons set forth below, we affirm in part, reverse in part, and remand the cause for further proceedings.

¶ 5 I. BACKGROUND

¶ 6 A. The Four Parcels

¶ 7 Plaintiff seeks tax exemptions for four parcels of land in Urbana: 611 West Park Street (the main hospital, operated by plaintiff's affiliate, Carle Foundation Hospital); 607 North Orchard Street (the north tower); 809 West Park Street (the Caring Place childcare facility, which serves families of plaintiff's employees, among others); and 503 North Coler Avenue (the power plant, which serves the other parcels).

¶ 8 B. Reclassification of the Parcels from Exempt to Nonexempt

¶ 9 Prior to 2004, the four parcels were considered exempt from taxation under section 15-65(a) of the Property Tax Code (35 ILCS 200/15-65(a) (West 2002)) because of their charitable use. In 2004, however, the Cunningham Township assessor began assessing the four parcels at their full value (*i.e.*, as nonexempt), which she continued doing through 2011.

¶ 10 C. Plaintiff's Application for Restoration of the Exemptions

¶ 11 Plaintiff filed applications with the county board of review asking it to exempt the four parcels from taxation for the years 2004 and 2005. The board forwarded these applications to the Department along with a recommendation of denial. In February 2007, the Department denied the applications for 2004 and 2005, and plaintiff requested an administrative hearing.

¶ 12        In 2010, plaintiff withdrew its applications for 2004 and 2005, and an administrative hearing scheduled for that August was canceled. Despite plaintiff's request to withdraw the applications for 2004 and 2005, the Department issued formal letters denying these applications. Plaintiff did not request a rehearing.

¶ 13        Plaintiff subsequently filed applications with the county board to exempt the four parcels for the years 2006, 2007, and 2008. The county board recommended denial of those applications and forwarded them to the Department for a decision.

¶ 14        In March 2012, plaintiff withdrew its applications for 2006 to 2008 before the Department had made an initial decision on them. Later that month and despite plaintiff's notification of withdrawal, the Department issued formal denials of the applications for 2006 through 2008. Plaintiff did not request an administrative hearing.

¶ 15        No applications to exempt the four parcels from taxation were filed for 2009 through 2011. In 2012, the four parcels were determined to be exempt from taxation on a partial basis. The exemption awarded for the 2012 tax assessment year was issued under section 15-86(c) of the Property Tax Code (35 ILCS 200/15-86(c) (West 2012)) following plaintiff's filing of section 15-5 applications. See *id.* § 15-5. As explained below, section 15-86 was enacted in 2012 and replaced section 15-65 (as to hospitals seeking charitable exemptions), which had been the basis for charitable tax exemptions for all taxpayers, including hospitals, prior to 2004. Pub. Act 97-688 (eff. June 14, 2012) (adding 35 ILCS 200/15-86).

¶ 16                        D. Plaintiff's Lawsuit

¶ 17        In December 2007, plaintiff filed an action in the circuit court of Cook County against the Department and various local governmental entities pursuant to section 23-25(e) seeking a declaratory judgment that, under section 15-65 (35 ILCS 200/15-65 (West 2006)),

the four parcels were exempt from taxation for the years 2004 through 2007 based on "comparable grounds" to those leading to allowance of the exemption in prior years; plaintiff also sought a refund of any taxes paid. The case was transferred to the circuit court of Champaign County in September 2008.

¶ 18                         E. Our Decision in *Carle I*

¶ 19        In March 2009, following the circuit court's denial of defendants' motion to dismiss plaintiff's complaint, the circuit court certified a series of questions for interlocutory appeal (see Ill. S. Ct. R. 308(a) (eff. Feb. 1, 1994)), requesting guidance on the meaning of the statutory phrase "court proceedings to establish an exemption" in section 23-25(e). In an opinion filed in October 2009, this court held that, in cases where the Department or a court of review had acted favorably on a comparable exemption claim for any other year, section 23-25(e) had effectively revived the traditional suit in equity to establish an exemption. *Carle Foundation v. Department of Revenue*, 396 Ill. App. 3d 329, 340 (2009) (*Carle I*). This court further held that a taxpayer must elect its remedy instead of simultaneously pursuing both a judicial action under section 23-25(e) and an application before the Department. *Id.* at 342. However, because no court had ever before interpreted section 23-25(e), we allowed plaintiff, on remand, to elect one of those remedies. *Id.* at 343.

¶ 20                         F. Subsequent Amended Complaints

¶ 21        Plaintiff elected the judicial route, filing a first amended complaint in May 2010 that added a claim that Cunningham Township's assessor was not authorized to revoke the exemptions, an unjust enrichment claim, and a claim asserting that defendants Cunningham Township and the City of Urbana breached an agreement settling the dispute between them. Plaintiff alleged it had paid $775,000 to various local taxing bodies under the settlement

agreement; in return, the local taxing bodies promised to "refrain from taking any action to challenge [plaintiff's] entitlement to charitable exemptions with respect to certain properties owned by [plaintiff], including the Four Parcels involved in this litigation." Plaintiff further added claims for tax exemptions for the years 2008 and 2009.

¶ 22    A second amended complaint was filed in August of that same year, which plaintiff said was "for the primary purposes of deleting one cause of action [(the unjust enrichment action)], revising another [(breach of settlement contract)], and updating the current office holders of various public officials who [were] sued in their official capacities." A third amended complaint was filed in November 2011, asserting the original exemption claims relating to the four parcels from 2004 through 2009, a claim for unauthorized revocation of the tax exemptions, and a claim for breach of the settlement contract. Each of the amended complaints sought to establish "comparable grounds" based on section 15-65.

¶ 23                              G. Enactment of Section 15-86

¶ 24    Effective June 14, 2012, as part of Public Act 97-688, section 15-86 was enacted to clarify the "considerable uncertainty surrounding the test for charitable property tax exemption, especially regarding the application of a quantitative or monetary threshold" following our supreme court's decision in *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368 (2010). Pub. Act 97-688 (eff. Jun. 14, 2012) (adding 35 ILCS 200/15-86(a)(1)). The General Assembly declared the following:

> "Working with the Illinois hospital community and other interested parties, the General Assembly has developed a comprehensive combination of related legislation that addresses hospital property tax exemption, significantly increases access to free health care for indigent persons, and strengthens the Medical

- 6 -

Assistance program. It is the intent of the General Assembly to establish a new category of ownership for charitable property tax exemption to be applied to not-for-profit hospitals and hospital affiliates in lieu of the existing ownership category of 'institutions of public charity'. It is also the intent of the General Assembly to establish quantifiable standards for the issuance of charitable exemptions for such property." *Id.* (adding 35 ILCS 200/15-86(a)(5)).

¶ 25 Titled "exemptions related to access to hospital and health care services by low-income and underserved individuals," section 15-86(c) provides, in relevant part:

"A hospital applicant satisfies the conditions for an exemption under this Section with respect to the subject property, and shall be issued a charitable exemption for that property, if the value of services or activities listed in subsection (e) for the hospital year equals or exceeds the relevant hospital entity's estimated property tax liability, as determined under subsection (g), for the year for which exemption is sought." *Id.* (adding 35 ILCS 200/15-86(c)).

¶ 26 Subsections (e) through (g) set forth the methodology to calculate "the value of services or activities" and "the relevant hospital entity's estimated property tax liability." *Id.* (adding 35 ILCS 200/15-86(e)-(g)). "If a parcel has both exempt and non-exempt uses, an exemption may be granted for the qualifying portion of that parcel." *Id.* (adding 35 ILCS 200/15-86(c)).

¶ 27                              H. 2012 Exemptions

¶ 28 In early 2013, the four parcels in question were awarded charitable use exemptions for the 2012 tax year pursuant to section 15-86, resulting from a section 15-5 application submission.

¶ 29                                    I. Settlement of Some Claims

¶ 30          Plaintiff reached a settlement with defendants Urbana Park District and Urbana

School District in November 2013 and dismissed each of them from the case.

¶ 31                                   J. The Fourth Amended Complaint

¶ 32          Plaintiff filed a fourth amended complaint in January 2014 asserting that the four

parcels should be exempt from real estate taxes during the 2004 through 2012 tax assessment years

on the ground of charitable use per "comparable grounds" analysis under section 15-86 and,

alternatively, section 15-65 (years 2010 and 2011 were added under the amendment). The section

15-86 claims compared the years 2004 through 2011 to the 2012 tax year, the most recent year in

which a charitable use tax exemption had been allowed.

¶ 33          The fourth amended complaint sets forth 35 counts falling into four categories of

legal theories. The first category consists of count I, which asserts that the preexisting exemptions

of the four parcels were never validly discontinued. In plaintiff's view, the local taxing officials

lacked the statutory authority to reassess the property and terminate the exemptions.

¶ 34          The second category of claims consists of count II, which sought a declaratory

judgment "that Section 15-86 applies to any determination of [plaintiff's] entitlement to

exemptions for the Four Parcels for tax assessment years 2004 through 2011."

¶ 35          The third category is composed of counts III through XXIV, which assert in the

alternative that, if the local taxing authorities had authority to return the four parcels to the tax rolls

and "thereby force [plaintiff] to establish anew its entitlement to an exemption on those properties,

*de novo* consideration of the exemption issue [would lead] to the conclusion that [plaintiff] has

satisfied the legal criteria for an exemption for each of the parcels and tax years in question," 2004

through 2011. According to counts III through XXIV, this "legal criteria" meant "the recently

enacted section 15-86 (35 ILCS 200/15-86 (West 2014)); or, alternatively, if section 15-86 is inapplicable, the former provision of the Code, section 15-65 (35 ILCS 200/15-65 (West 2014))."

¶ 36    The fourth category consists of count XXXV, in which plaintiff again asserted a breach of the 2002 settlement agreement.

¶ 37    K. Summary Judgment on Count II of the Fourth Amended Complaint

¶ 38    Plaintiff moved for summary judgment on count II of its fourth amended complaint, which sought a declaratory judgment that the newly enacted section 15-86 of the Property Tax Code applied to the claims for exemption in counts III through XXIV, covering the period of 2004 through 2011.

¶ 39    The trial court granted plaintiff's motion for summary judgment on count II. Later, in a modified opinion, the court held that section 15-86 applied to plaintiff's claims of exemption and that, by enacting section 15-86, the legislature had repudiated the supreme court's description of "the distinctive characteristics of a charitable institution" in *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 157 (1968). The modified opinion included a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Jan. 1, 1989).

¶ 40    L. *Carle II*

¶ 41    On interlocutory appeal from the entry of summary judgment on count II, this court concluded that section 15-86, which specified the conditions for a hospital to obtain a charitable exemption, applied retroactively but violated the state constitutional provision governing the General Assembly's authority to exempt property from taxation (Ill. Const. 1970, art. IX, § 6). *Carle Foundation v. Cunningham Township*, 2016 IL App (4th) 140795, ¶¶ 58, 110, 113, 164 (*Carle II*). As a result, we reversed the summary judgment order and remanded the case for further proceedings. *Id.* ¶ 166. On appeal to the Illinois Supreme Court, however, our decision in *Carle II*

was vacated on jurisdictional grounds. *Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶¶ 18, 23, 36. The supreme court did not rule on any substantive matters and instead remanded the case for further proceedings.

¶ 42                                    M. 2018 Rulings on Count I

¶ 43           On remand, plaintiff moved for summary judgment on count I, which asserted that various local taxing officials wrongfully discontinued plaintiff's exemptions for the four parcels. The trial court denied plaintiff's summary judgment motion on September 4, 2018, concluding that, although there was no question of material fact related to count I, plaintiff had failed to establish that its right to judgment as a matter of law was "clear and free from doubt." According to the court, "the local assessors had the authority to assess and, even if they did not, the assessments [were] still valid because the Board of review and [Department] had the authority to act." The court observed, "there was no wrongful termination of exemptions." Defendants filed their own summary judgment on the same issue, and on December 4, 2018, the trial court granted defendants' motion and entered judgment against plaintiff on count I of the fourth amended complaint.

¶ 44           N. Order on Application of *Korzen* Factors Following *Oswald*

¶ 45           Following the supreme court's decision in *Oswald v. Hamer*, 2018 IL 122203, which upheld the facial constitutionality of section 15-86, the parties simultaneously moved for a determination of whether *Oswald* changed what a plaintiff must prove to establish a tax exemption. Plaintiff argued that it need only prove two things: (1) satisfaction of the requirements of section 15-86 and (2) the new constitutional test set forth in *Oswald*. Plaintiff asserted that the new *Oswald* test required it to prove (1) that it provides charity for the benefit of an indefinite number of persons, which reduces the burdens of government and (2) that its primary purpose is charitable.

Plaintiff contended that *Oswald* only discussed two of *Korzen*'s factors—those relating to charitable use—and that *Oswald* discarded the factors pertaining to ownership. Defendants disagreed and argued that all *Korzen* factors must still be proven.

¶ 46    In its November 2018 order, the trial court found that "*Oswald* did not change the requirements to obtain a charitable exemption" and that "all *Korzen* factors are a part of the constitutional charitable use test." However, the court clarified that "the *Korzen* factors dealing with ownership are only relevant if they can be shown to have affected the way in which Plaintiff uses its property."

¶ 47                    O. Withdrawal of Plaintiff's Section 15-65 Claims

¶ 48    In September 2018, following issuance of the supreme court's decision in *Oswald*, plaintiff moved to voluntarily dismiss its claims seeking property tax exemptions under section 15-65. Plaintiff's motion was allowed, subject to the following limitation:

> "The Defendants are not acquiescing to [plaintiff] later refiling claims under Section 15-65 in this matter, or otherwise litigating its Section 15-65 claims apart from its claims seeking exemption under Section 15-86 of the Property Tax Code, and nothing in this Order shall be construed as a ruling on the issue of whether [plaintiff] would be allowed to file such Section 15-65 claims at a later date."

¶ 49                            P. 2019 Bench Trial

¶ 50    In January 2019, the case proceeded to a bench trial on the remaining issues in the litigation: (1) as to counts III through XXXIV, whether plaintiff was entitled to property tax exemptions (full or partial) from 2004 through 2011 for the four parcels because plaintiff had met both the statutory requirements of section 15-86 and the constitutional requirements outlined in *Korzen* and *Oswald* and (2) as to count XXXV, whether defendants Cunningham Township and

the City of Urbana breached a 2002 settlement agreement with plaintiff that prevented those defendants from challenging plaintiff's requests for property tax exemptions on the four parcels.

¶ 51                    Q. Trial Court Order of February 2020

¶ 52          The trial court issued a written opinion and order on February 5, 2020, again finding that plaintiff qualified for a section 15-86 exemption. It further found that, based on the evidence presented at trial, plaintiff demonstrated it was entitled to a section 15-86 exemption for the years 2005 through 2011 (though some were partial exemptions). The court conducted both a *de novo* review of the entitlements for 2004 through 2011 and a comparison between the base year of 2012 and the subject years of 2004 through 2011, reaching the same conclusion under both analyses. The court denied, however, the requested tax exemption for 2004. It also found in favor of defendants on plaintiff's claim that the exemption assessment was unauthorized (count I) and on plaintiff's breach of contract claim (count XXXV). The court further denied plaintiff's request for prejudgment interest on the damages awarded under counts III through XXXIV.

¶ 53          The Champaign County Treasurer was ordered to issue a refund to plaintiff in the amount of $6,240,491.53, with the refund to be assessed on a *pro rata* basis against all relevant taxing districts except the settling parties.

¶ 54               R. Posttrial Motion, Bill of Costs, and Disposition

¶ 55          Plaintiff filed a timely posttrial motion, after which the court issued a memorandum opinion and order modifying its original judgment. In its July 15, 2020, order, the trial court denied plaintiff's request for costs associated with preparation of trial transcripts but awarded the costs of witness fees. The court then denied plaintiff's request for prejudgment interest.

¶ 56          The court then modified a portion of the February 5, 2020, ruling regarding the denial of tax exemptions status for 2004 (specifically identifying counts III, XI, XIX, and XXVII),

- 12 -

clarified its ruling to correlate to specific counts of the fourth amended complaint, and modified paragraph nine of its original order to state that the refund awarded "shall be assessed on a *pro rata* basis against all relevant taxing districts *that received property tax from the Foundation for the tax assessment years and parcels described* \*\*\* with the exception of the Urbana School District #116 and the Urbana Park District (collectively called the Settling Parties)." (Emphasis in original, representing the words added by the July 15 order.).

¶ 57          This appeal followed.

¶ 58                                   II. ANALYSIS

¶ 59          At the outset, we note that this is a complex case that has been intensely litigated in the courts since 2007 and has already seen two prior appeals to this court and one to the Illinois Supreme Court. The parties have filed detailed briefs collectively totaling more than 500 pages, and the trial court's multiple rulings easily surpass 300 pages. Many of the issues presented are novel questions of law requiring the interpretation of relatively new amendments to the Property Tax Code. We commend the efforts of the trial court in shepherding the facts and streamlining the issues for appeal.

¶ 60          Defendants appeal the trial court's award of charitable use tax exemptions for 2005 through 2011, challenging several aspects of the court's ruling, including the applicability of section 23-25(e), the constitutionality and applicability of section 15-86, the court's determination of charitable use under section 15-86(c)'s factor analysis, and whether plaintiff's use of the four parcels was in fact "charitable" under article IX, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, § 6). Plaintiff cross-appeals from the trial court's denial of its exemption for 2004, its denial of prejudgment interest, and the summary judgment it entered on count I of the fourth amended complaint.

¶ 61                              A. The Main Appeals

¶ 62          We begin by setting out the framework for our analysis.

¶ 63                          1. *The Exemption Process*

¶ 64          A taxpayer seeking a charitable use exemption has two options. First, a taxpayer attempting to establish an exemption for the *first time* must file an application pursuant to section 15-5 of the Property Tax Code. 35 ILCS 200/15-5 (West 2022). Once filed, the taxpayer then proceeds administratively before the Department (see generally *id.* §§ 8-35, 16-70, 16-130) and, after completing the administrative process, may seek judicial review of the administrative decision pursuant to the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2022)).

¶ 65          Second, a party seeking to *maintain or reclaim* an exemption, as plaintiff is doing here, has two groups of options. The property owner can pursue administrative remedies either by (1) filing a section 15-5 application and seeking an administrative determination of the exemption (like the process used by a taxpayer seeking a first-time exemption) or (2) filing a certification concerning change in use, as outlined in sections 15-10 and 15-20 of the Property Tax Code (35 ILCS 200/15-10, 15-20 (West 2022)). Alternatively, the property owner can seek a judicial determination of its claimed exemption using section 23-25(e). *Id.* § 23-25(e).

¶ 66          We now explore the latter option—a judicial proceeding under section 23-25(e)— as it was the method selected by plaintiff here.

¶ 67          2. *Section 23-25(e) Claims for Judicial Determination of an Exemption*

¶ 68          Section 23-25(e) allows a taxpayer to seek a judicial determination as to tax exempt status once a previously granted tax exemption has been revoked or terminated. *Id.* Although section 23-25(a) generally prohibits a taxpayer from "seek[ing] a judicial determination as to tax exempt status" (*id.* § 23-25(a)), section 23-25(e) provides a limited exception where, "for any

specific assessment year, \*\*\* *the plaintiff or its predecessor in interest in the property has established an exemption for any subsequent or prior assessment year on grounds comparable to those alleged in the court proceedings*." (Emphasis added.) *Id.* § 23-25(e). The only caveat is that, for purposes of subsection (e), "the exemption for a subsequent or prior year must have been determined under Section 8-35 or a prior similar law by the Department or a predecessor agency, or under Section 8-40." *Id.*

¶ 69        In *Carle I*, we held that section 23-25(e) effectively " 'revives the traditional suit in equity for injunction as one of the primary means of establishing a claim for exemption, provided that the Department \*\*\* (or a court on review) has acted favorably on a comparable claim for any other year.' " *Carle I*, 396 Ill. App. 3d at 340 (quoting Michael F. Baccash *et al.*, *Taxable and Exempt Property*, in Real Estate Taxation § 1.108, at 1-112 (Ill. Inst. for Cont. Legal Educ. 2008)). Indeed, "[t]he very purpose of sections 23-25(a) and (e) is to enable a taxpayer to avoid the administrative process if the conditions in subsection (e) are met." *Id.* at 343.

¶ 70        The fourth amended complaint, which was the relevant pleading before the trial court, asserted "comparable grounds" under section 15-86 as to years 2004 through 2011 (and, alternatively, under section 15-65 using different base years). Using the exemption allowed for the 2012 tax year as its "base year," the trial court conducted its "comparable grounds" analysis—as required by section 23-25(e)—and considered tax years 2004 through 2011 through the lens of section 15-86(c)'s exemption standard.

¶ 71        Defendants urge us to limit *Carle I* to allow a plaintiff to elect remedies solely from those available at the time *Carle I* was decided, *i.e.*, a section 15-65 claim before the Department or a section 15-65 claim before the circuit court. They assert that "[n]othing in *Carle I* even anticipated the later passage of section 15-86, much less implied a section 15-86 cause of action

- 15 -

in the circuit court." However, we decline to give *Carle I* such a narrow reading, as it did not suggest limits on judicial suit plaintiffs' remedies or confine them to utilizing *only* section 15-65. Rather, *Carle I* held that section 23-25(e) allowed a judicial suit in equity for an injunction as " 'one of the primary means of establishing a claim for exemption.' " *Id.* at 340 (quoting Baccash *et al.*, *supra*, at 1-112). Indeed, the only limitation discussed by *Carle I* was the statutory requirement that the "Department *** (or a court on review) has acted favorably on a comparable claim for any other year." (Internal quotation marks omitted.) *Id.*

¶ 72    We find that, in considering plaintiff's section 23-25(e) claim, the trial court applied the correct analysis by examining whether there are "comparable grounds" for an exemption in the years at issue as compared to a prior or subsequent base year.

¶ 73    3. *"Comparable Grounds" Analysis Under Section 23-25(e)*

¶ 74    Having concluded that plaintiff properly utilized section 23-25 to bring its judicial exemption claims, we are now tasked with identifying the standard a court uses to determine if the previously awarded, but subsequently revoked, charitable tax exemptions should be reinstated. Section 23-25(e) seems to answer this question: section 23-25(e) requires a court to conduct a "comparable grounds" analysis of the years for which exemptions are sought versus a base year where the exemption was allowed. 35 ILCS 200/23-25(e) (West 2022). In the instant case, plaintiff used 2012 as the base year, a year in which a charitable use exemption was awarded using section 15-86. Necessarily, a court conducting its section 23-25(e) "comparable grounds" analysis under the facts of this case *must* use section 15-86 in comparing the years at issue against the base year.

¶ 75    We conclude that the General Assembly must have intended section 15-86 to apply, at least indirectly, in judicial proceedings brought under section 23-25(e). Stated another way, if section 15-86 was the authority for exempting the property from taxation for a subsequent or prior

assessment year, then section 15-86 would indirectly apply to the proceeding under section 23-25(e) through a comparable grounds analysis.

¶ 76       The methodology for performing this comparison was well expressed in our now vacated opinion in *Carle II*:

"In an action pursuant to section 23-25(e), the plaintiff would allege and prove that, as to the subject property, a certain set of facts existed during the assessment year in question and that substantially the same facts caused that property to be exempt for a subsequent or prior assessment year. By hearing this evidence, the circuit court would not make a *de novo* determination, so much as compare two sets of facts, to see if the Department is being inconsistent or arbitrary.

Unless the two sets of facts are materially different or unless the Department convinces the circuit court that the exemption for the subsequent or prior assessment year actually was unlawful *** logic would likewise require an exemption for the assessment year in question." *Carle II*, 2016 IL App (4th) 140795, ¶¶ 94-95.

¶ 77       Such an approach comports with the plain language of section 23-25(e). Section 23-25(e) is meant to be an alternative to administrative proceedings, though not a mirror image. We therefore conclude that section 15-86 applies, albeit indirectly, to the instant action because the exemption awarded in the base year of 2012 was given under section 15-86.

¶ 78       The question becomes more complex, however, when the years at issue *predate* the adoption of section 15-86 in 2012. Does the comparable grounds analysis require examination of the charitable use under a standard that was not adopted until later? According to defendants, section 15-86 cannot be applied retroactively.

¶ 79        4. *Can Section 15-86 Be Retroactively Applied to Determine Tax-Exempt Status?*

¶ 80        Defendants challenge whether section 15-86 applies to a judicial proceeding under section 23-25(e) on two general grounds. First, they claim that section 90 (35 ILCS 128/90 (West 2022)), which was enacted as part of Public Act 97-688 (eff. June 14, 2012), precludes section 15-86's application in this case because (1) plaintiff had not filed an administrative "application" under section 90 and (2) plaintiff's section 23-25(e) claims were judicial and, therefore, were not administrative matters pending before the Department at the time section 15-86 was enacted in 2012. Second, defendants assert that plaintiff is not an "applicant" under section 15-86 and, therefore, cannot comply with that provision.

¶ 81        a. Section 15-86's Temporal Reach Under Section 90

¶ 82        When Public Act 97-688 was enacted in 2012, it contained a clause purporting to define the temporal reach of the various provisions contained in that legislation, including section 15-86. The pertinent part of sections 90(2) and (3) reads as follows:

> "The changes made by [P.A. 97-688] *** to the Property Tax Code *** shall apply to: *** (2) all applications for property tax exemption filed by hospitals, hospital owners, hospital affiliates, or hospital systems on or after the effective date of this amendatory Act of the 97th General Assembly; (3) all applications for property tax exemption filed by hospitals, hospital owners, hospital affiliates, or hospital systems that have either not been decided by the Department before the effective date of this amendatory Act of the 97th General Assembly, or for which any such Department decisions are not final and non-appealable as of that date ***." 35 ILCS 128/90(2), (3) (West 2022).

¶ 83    Defendants argue that section 90(2) applies only to *administrative applications* filed after the effective date and that section 90(3) applies only to *administrative applications* to establish tax exemption claims previously filed and pending before the Department as of June 14, 2012, when section 15-86 became effective. Defendants assert that section 90 does not apply to claims previously filed with and pending before a circuit court brought pursuant to section 23-25(e). Critical to defendants' position is whether the term "applications" and the clause in which it appears in section 90(3) should be construed to include pending claims brought pursuant to section 23-25(e) and whether the prior administrative claims filed by plaintiff for 2004 through 2008 were final decisions no longer subject to review.

¶ 84    i. *Is a Section 23-25(e) Suit an "Application" Under Sections 90(2) and (3)?*

¶ 85    At the outset, we note that neither Public Act 97-688 nor section 90 defines the term "application." Defendants assert that an "application" refers solely to an *administrative* proceeding under section 15-5 and not to a judicial claim, that the word "applicant" is a "term of art," and that resort to its commonplace meaning is unreasonable.

¶ 86    We are required to construe the meaning of the word "application" in section 90, and the principles guiding our analysis are familiar. The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 13 (2007). All other rules of statutory construction are subordinate to this cardinal principle. *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008) (citing *In re Detention of Lieberman*, 201 Ill. 2d 300, 312 (2002)).

¶ 87    In determining legislative intent, our first step is to examine the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded

its plain, ordinary, and popularly understood meaning. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003). Where the language is clear and unambiguous, the statute must be given effect as written, without resort to further aids of statutory construction. *Krautsack v. Anderson*, 223 Ill. 2d 541, 553 (2006). In construing a statute, "we presume that the legislature did not intend absurdity, inconvenience or injustice." *Alvarez*, 229 Ill. 2d at 228 (citing *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001)). A case involving statutory construction presents a question of law, which we review *de novo*. *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 18 (citing *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50, and *Chicago Teachers Union, Local No. 1 v. Board of Education of Chicago*, 2012 IL 112566, ¶ 15).

¶ 88 Sections 90(2) and 90(3) both reference "all applications for property tax exemption filed by hospitals." 35 ILCS 128/90(2), (3) (West 2022). We cannot agree with defendants' contention that the word "application" as used in sections 90(2) and (3) should be treated as a term of art under the Property Tax Code, rather than being given "its plain, ordinary and popularly understood meaning." *Sherman*, 203 Ill. 2d at 279. In *Universal Scrap Metals, Inc. v. J. Sandman & Sons, Inc.*, 337 Ill. App. 3d 501, 505 (2003), the court defined a "term of art" as follows: "A term of art is defined as 'a word or phrase having a specific signification in a particular art, craft or department of knowledge; a technical term.' " (quoting Webster's Third New International Dictionary (1993)). The word "applications" might *commonly* be used in reference to applications in the administrative setting, but defendants beg the question when they presume that it can *only* refer to applications in that setting. In *Bevis v. Pollution Control Board*, 289 Ill. App. 3d 432, 436 (1997), the court found that the undefined term "applicant" in the context of the Environmental Protection Act (415 ILCS 5/39.2 (West 1992)) simply meant "one who applies."

(Emphases omitted.) Here, we also give the word its common meaning and understanding, that of a request or a petition. See, *e.g.*, Black's Law Dictionary 115 (9th ed 2009) (defining the term generically as "[a] request or petition").

¶ 89 We must also consider the statute "in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *People v. Davis*, 199 Ill. 2d 130, 135 (2002) (citing *Gill v. Miller*, 94 Ill. 2d 52, 56 (1983)). It is readily apparent that, in enacting the pertinent provisions of Public Act 97-688, the legislature intended to create a simplified method for the resolution of claims for tax exemption brought by purveyors of health care services. This intent is clear from section 15-86(a)(1), which states, in part: "Despite the Supreme Court's decision in *Provena Covenant Medical Center v. Dept. of Revenue*, 236 Ill.2d 368, there is considerable uncertainty surrounding the test for charitable property tax exemption, especially regarding the application of a quantitative or monetary threshold." 35 ILCS 200/15-86(a)(1) (West 2022). Moreover, subsection (a)(5) stated:

> "[T]he General Assembly has developed a comprehensive combination of related legislation that addresses hospital property tax exemption, significantly increases access to free health care for indigent persons, and strengthens the Medical Assistance program. It is the intent of the General Assembly to establish a new category of ownership for charitable property tax exemption to be applied to not-for-profit hospitals and hospital affiliates in lieu of the existing ownership category of 'institutions of public charity.' " *Id.* § 15-86(a)(5).

¶ 90 A plain reading of section 90 shows that the General Assembly intended the new standards set forth in section 15-86 to apply to exemption claims that are (1) new, (2) pending, or (3) not yet resolved with finality. The third category would include, necessarily, exemption claims

- 21 -

that have been decided but are either subject to or pending review or appeal. Given this conclusion, the new standard of section 15-86 is properly considered applicable in the *litigation* of new exemption claims, as well as in those that are either pending or not yet finally resolved. It is equally clear that section 90 does not permit the new standard to be used for the purpose of relitigating exemption claims that have been resolved with legal finality.

¶ 91       We conclude that, in enacting section 90(3), the legislature clearly intended that the new and simplified standard of section 15-86 would apply to *all* exemption claims, including those filed pursuant to section 23-25(e) that were pending at the time of the enactment. It is difficult to imagine why the Illinois General Assembly, seeking to eliminate the "considerable uncertainty" caused by the old standard, intended that claims pending under section 23-25(e) would continue to be governed by that very standard.

¶ 92       Here, we remind the parties that we are construing plaintiff's claim under section 23-25(e), which provides a judicial *alternative* to an administrative proceeding. Section 23-25(e) does not expressly incorporate all aspects of section 15-86. Instead, it "borrows" or references the provisions of subsection (c) to determine whether the exemptions awarded in 2012 were on comparable grounds to the years 2004 through 2011, which is the subject matter of this lawsuit.

¶ 93       Alternatively, we note there is another way to view the question of whether section 90 authorizes section 15-86 to apply to charitable tax exemption issues from prior years. Looking at each of the three subsections of section 90, each presupposes the application of section 15-86 to property exemptions claimed for prior years. 35 ILCS 128/90(1)-(3) (West 2022). For example, if, as section 90(1) says, Public Act 97-688 applies to "all" decisions the Department makes on charitable exemptions on or after the effective date of Public Act 97-688 (June 14, 2012), it follows that section 15-86 applies to all those decisions, including decisions that were pending on June 14,

2012—decisions that necessarily scrutinized the uses made of property before that date. *Id.* § 90(1). Likewise, section 90(2) says that section 15-86 will apply to "all applications for property tax exemption filed *** on or after the effective date of this amendatory Act." *Id.* § 90(2). Thus, if a hospital filed an application on June 14, 2012, the application necessarily was based on uses made of the property before that date.

¶ 94      Likewise, under section 90(3), Public Act 97-688 applies to "all applications for property tax exemption filed by hospitals *** that have either not been decided by the Department before the effective date of this amendatory Act ***, or for which any such Department decisions are not final and non-appealable as of that date" (*id.* § 90(3)). Thus, if, on June 14, 2012, the Department made a nonfinal decision on an application for a property tax exemption—an application that necessarily concerned uses of the property earlier than June 14, 2012—section 15-86 would apply to that application.

¶ 95      We are mindful that a retroactive statute "operat[es] on transactions that have occurred or rights and obligations that existed before passage of the act." 2 Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 41:1, at 383 (7th ed. 2009). On its face, section 15-86 applies retroactively in requiring the exempt or nonexempt status of property to be determined based on the uses made of the property before June 14, 2012 (the effective date of section 15-86) or other facts existing before that date. This again illustrates that the legislature understood that section 15-86 would have at least some retroactive application, *i.e.*, it would apply to tax years prior to its enactment. Given these conclusions and our determination that a section 23-25(e) judicial plaintiff is an "applicant" under section 15-86, section 90 does not preclude section 15-86 from being applied to tax years prior to 2012 (its enactment) in the instant section 23-25(e) action.

¶ 96        ii. *Was There a Final Decision on Plaintiff's Prior Administrative Claims?*

¶ 97        Defendants further argue that plaintiff is barred from seeking a judicial remedy for the years 2004 through 2008 because section 15-5 administrative proceedings were filed and, in response to plaintiff's request that those proceedings be withdrawn, the Department issued an order denying those administrative claims. Under defendants' view, the resolution of these claims means that none were pending when section 15-86 became effective. Defendants further argue that the 2009 through 2011 claims are barred because plaintiff filed no administrative proceedings and thus do not fall within section 90(3).

¶ 98        For the reasons below—which may well be unique to this case—we reject these arguments.

¶ 99                    aa. Tax Years 2004 Through 2008

¶ 100       Concerning the administrative proceedings initially filed for the years 2004 through 2008, *Carle I* held that a taxpayer must elect its remedy instead of simultaneously pursuing both a judicial action under section 23-25(e) and administrative proceedings before the Department. *Carle I*, 396 Ill. App. 3d at 342. Moreover, because no court had ever before interpreted section 23-25(e), in *Carle I*, we allowed plaintiff to take a step backward and elect one of those remedies on remand. *Id.* at 343.

¶ 101       Following our remand after *Carle I*, plaintiff subsequently withdrew its administrative applications for years 2004 and 2005 in August 2010. We also find it significant that plaintiff and the Department entered into a stipulation whereby it was agreed that plaintiff's withdrawal of its requests for administrative hearing were "not intended, and neither that withdrawal, the [Department] Denials ***, nor the order terminating the Administrative Proceeding shall be asserted, to have any collateral estoppel or *res judicata* effect with respect to

[plaintiff's] exemption claims for any of the Four Parcels or any other properties owned by [plaintiff]." Plaintiff's formal withdrawal of requests for hearing filed in August 2010 was specifically based on that stipulation:

> "[P]ursuant to and in reliance on the Stipulation, [plaintiff] respectfully withdraws its request for hearing and asks that this administrative matter be terminated so as to enable it to seek to establish its entitlement to charitable property exemptions with respect to the properties and tax assessment years involved in the Litigation."

¶ 102   Plaintiff followed the path we suggested, so we afford no preclusive effect to the words chosen unilaterally by the Department on dismissal of plaintiff's claims. Plaintiff's claims were withdrawn as an election of remedies under section 23-25(e).

¶ 103   The administrative proceedings for years 2006 through 2008 were likewise withdrawn in plaintiff's March 2012 letter of withdrawal, which stated, in part:

> "By withdrawing the Application at this time, Applicant preserves and does not waive its right to take any and all actions, involving litigation or otherwise, including but not limited to actions pursuant to section 23-25(e) of the [P]roperty Tax Code, it may have now or in the future to seek, maintain, establish or reinstate the tax exempt status of the properties *** for the tax assessment years involves in the respective Applications ***."

¶ 104   The claims for years 2006 and 2007 were part of the original 2007 complaint. Years 2008 and 2009 were added by plaintiff's first amended complaint filed in May 2010. We conclude that the termination of these administrative proceedings and the so-called "administrative rulings"—which resulted from plaintiff's withdrawal of its claims and election of remedies—were

not final rulings on the merits of the claimed exemptions and as such do not preclude plaintiff's reliance on section 15-86.

¶ 105                                bb. Tax Years 2009 Through 2011

¶ 106        As to the 2009 through 2011 claims, no administrative proceedings were ever filed. Plaintiff made the election to join those claims with its previously filed section 23-25(e) claims; again, this is what we anticipated in *Carle I*. Section 90(2) makes it clear that section 15-86 applies to "all *applications* for property tax exemption filed by hospitals, hospital owners, hospital affiliates, or hospital systems on or after the effective date of this amendatory Act." (Emphasis added.) 35 ILCS 128/90(2) (West 2022). Because we conclude that "application" as used in section 90 includes a judicial proceeding under section 23-25(e), plaintiff has satisfied section 90(2).

¶ 107                        b. Who Is a Section 15-86 "Applicant"?

¶ 108        Similar to their argument concerning section 90, defendants assert that plaintiff was not an "applicant" under section 15-86, which they construe as applicable solely to administrative proceedings, not judicial proceedings under section 23-25(e). Defendants specifically point to the definitions of a "hospital applicant" in subsection (b)(6) of section 15-86, of "subject property" in subsection (b)(9), and finally to the language of section 15-86(h) defining an "application."

>       "(6) 'Hospital applicant' means a hospital owner or hospital affiliate that files an application for a property tax exemption pursuant to Section 15-5 and this Section.
>
>                                        ***
>
>       (8) 'Subject property' means property for which a hospital applicant files an application for an exemption pursuant to Section 15-5 and this Section." 35 ILCS 200/15-86(b)(6), (8) (West 2022).

¶ 109       Furthermore, defendants note that subsection (h), labeled "Application," states, "Each hospital applicant applying for a property tax exemption pursuant to Section 15-5 and this Section shall use an application form provided by the Department." *Id.* § 15-86(h).

¶ 110       These statutory definitions, however, do not lead us to the conclusion advanced by defendants. Just as we read "application" as a proceeding in an administrative or judicial capacity for the purposes of section 90(3), we must likewise reach the same conclusion with respect to who is an "applicant" under section 15-86. Again, the purpose of enacting section 15-86 was to simplify the standard for hospitals seeking a charitable tax exemption and to clarify the confusion resulting from the supreme court's decision in *Provena*. *Id.* § 15-86(a)(1), (5). The legislature clearly intended that the standards predating section 15-86—at least for hospitals—would no longer apply and that section 15-86's standards would apply unless the administrative proceedings had become final and no longer subject to review.

¶ 111       Our conclusion is bolstered when we consider that section 15-65, which was in effect at the time of *Carle I* and would have then applied to a hospital's charitable exemption claim, also uses the words "applicant" and "application." For example, under section 15-65(c), an "[o]ld people's home" seeking a charitable use exemption would be considered exempt when "actually and exclusively used" for a charitable or beneficent purpose. *Id.* § 15-65(c). Thus, *Carle I* clearly envisioned a taxpayer utilizing a judicial action under section 23-25(e) to advance a "comparable grounds" analysis employing section 15-65 (now inapplicable to plaintiff because of section 15-86), which also spoke of "applicant[s]" and "application[s]." Therefore, we see no preclusion in doing the same with section 15-86.

¶ 112       Moreover, versions of sections 15-5, 15-10, and 15-20 (administrative procedures the Department claims should have been followed in order to reclaim a lost charitable use

exemption versus section 23-25(e)) likewise existed. Thus, many foundations of defendants' arguments in favor of a narrow interpretation of section 15-86 likewise existed at the time *Carle I* was decided and made no difference to our interpretation of the remedies available under section 23-25(e).

¶ 113 For the same reasons that we concluded section 90's use of "applications" includes judicial exemption claims under section 23-25(e), we likewise conclude that section 15-86's use of "applicants" must be read in a consistent manner. Once again, defendants' interpretation would mean that the two alternative methods for obtaining the same relief—an exemption—are governed by two different legal standards, one of which the General Assembly expressly rejected for hospitals through its enactment of section 15-86.

¶ 114 While defendants contend that our conclusion ignores the plain language of section 15-86, we point to the rule of construction requiring that "words in a statute be read in context, rather than in isolation, and without rendering any of the statutory language superfluous." *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 21 (citing *Chicago Teachers Union, Local No. 1*, 2012 IL 112566, ¶ 15, *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 26, and *In re Marriage of King*, 208 Ill. 2d 332, 343 (2003)). Defendants' interpretation employs an overly narrow reading of a specific word taken out of its larger context. Section 23-25(e) is a judicial alternative to an administrative proceeding, but both avenues seek the same substantive end; we discern no legislative intention to subject the two paths to a different substantive standard.

¶ 115 Finally, although the parties have devoted significant time to analyzing the language of section 15-86 and, in particular, its use of the word "applicant," we find significant the language of subsection (i), which reads as follows:

"Nothing in this Section shall be construed to limit the ability of otherwise eligible hospitals, hospital owners, hospital affiliates, or hospital systems to obtain or maintain property tax exemptions pursuant to a provision of the Property Tax Code other than this Section." 35 ILCS 200/15-86(i) (West 2022).

¶ 116     Although no case has yet interpreted this provision, on its face it states that nothing in section 15-86 "shall be construed to limit the ability of otherwise eligible hospitals *** to obtain or maintain property tax exemptions pursuant to" section 23-25(e). *Id.* This necessarily defeats the linguistic limitations that defendants claim are created by the use of the word "applicant" in section 15-86. Based on section 15-86(i), we conclude that section 15-86's "comparable grounds" analysis applies to a judicial action under section 23-25(e).

¶ 117                    5. *Is Section 15-86 Facially Constitutional?*

¶ 118     In *Oswald*, the supreme court held that section 15-86 was facially constitutional under the so-called "no set of circumstances" test. *Oswald*, 2018 IL 122203, ¶ 40. Under that test, "[a] statute is facially invalid only if no set of circumstances exists under which the statute would be valid." *Id.* (citing *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008), *In re Parentage of John M.*, 212 Ill. 2d 253, 269 (2004), and *United States v. Salerno*, 481 U.S. 739, 745 (1987)). While *Oswald* certainly recognized that future "as applied" challenges might arise from the facts of future cases (*id.* ¶ 43), it appeared to settle the matter of the facial constitutionality of section 15-86 on issues like those raised here.

¶ 119     Defendants Cunningham Township and the City of Urbana, however, advocate that we revisit this constitutional determination, but using a different constitutional standard: a "valid rule facial challenge." It is suggested that such a standard would apply where there is a constitutional defect inherent in the terms of the statute itself, regardless of how it may apply to a

- 29 -

particular case. *People v. One 1998 GMC*, 2011 IL 110236, ¶ 86 (Karmeier, J., specially concurring). In other words, it is asserted that the statute here can be challenged on its face because it sets forth a "rule" that is at odds with the one set forth by the constitution.

¶ 120 We need not determine whether a "valid rule" facial challenge presents a separate basis to test constitutionality. In respect to section 15-86, the supreme court in *Oswald* has already reconciled the statute's content with the constitutional requirement as a matter of judicial construction. In *Oswald*, the supreme court noted its awareness that "section 15-86(c) does not expressly provide that the hospital charitable property tax exemption is limited to applicants that satisfy the constitutional requirement of exclusive charitable use," but it construed the statute to contain such a requirement because it "presume[d] that the legislature intended to comply with this constitutional limitation." *Oswald*, 2018 IL 122203, ¶ 33.

¶ 121 Because the Illinois Supreme Court established in *Oswald* that the provisions of section 15-86 implicitly incorporate the same requirements specified by the constitution, there is no reason to address the alternative "valid rule" analysis offered by Cunningham Township and the City of Urbana.

¶ 122 6. *Substantive Application of Section 15-86(c)'s Factors*

¶ 123 Now that we have discussed the application of section 15-86 through section 23-25(e), we turn to the results of the nearly monthlong bench trial of this case. The trial court's written decision following trial spanned more than 140 pages and addressed the testimony of 24 witnesses, including an expert from each side. Generally, its order was structured around two central issues: (1) whether plaintiff complied with section 15-86 and (2) if so, whether plaintiff satisfied the constitutional "charitable use" standard. Both issues are fact-intensive. In reviewing the trial court's factual determinations, we apply a manifest weight standard of review. *Diocese of*

*Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 38. Under that standard, a trial court's factual findings are reversed only where an opposite result is clearly apparent or if they appear to be arbitrary, unreasonable, or not based on the evidence. *Id.* (citing *Green v. Papa*, 2014 IL App (5th) 130029, ¶ 32).

¶ 124 We first examine the court's findings respecting plaintiff's compliance with section 15-86(c). The statute outlines the standard for the hospital charitable property tax exemption, in pertinent part, as follows:

> "A hospital applicant satisfies the conditions for an exemption under this Section with respect to the subject property, and shall be issued a charitable exemption for that property, if the value of services or activities listed in subsection (e) for the hospital year equals or exceeds the relevant hospital entity's estimated property tax liability, as determined under subsection (g), for the year for which exemption is sought." 35 ILCS 200/15-86(c) (West 2022).

Subsection (e) lists the "services and activities" that are considered in making the calculations required by subsection (c). These include "[c]harity care," defined as "[f]ree or discounted services *** measured at cost"; health services to low-income and underinsured individuals; subsidy of state or local governments; support for state health care programs for low-income individuals; subsidy for treating dual-eligibility Medicare/Medicaid patients; relief of the burden of government-related health care of low-income individuals; and "[a]ny other activity by the relevant hospital entity that the Department determines relieves the burden of government or addresses the health of low-income or underserved individuals." *Id.* § 15-86(e)(1)-(7); *Oswald*, 2018 IL 122203, ¶¶ 26-27.

¶ 125 a. Does Section 23-25(e) Require a *De Novo* Analysis or a Comparison?

¶ 126　　　　A preliminary issue is raised here as to whether the trial court should perform a *de novo* analysis of the section 15-86 factors for each of the subject years or whether it should instead compare the activities in the subject years to those in the base year, here 2012.

¶ 127　　　　The trial court accepted plaintiff's argument that a section 23-25(e) "comparative grounds" analysis should focus on "a comparison between the grounds supporting an exemption for the base year (2012) and the subject years (2004-2011) and that [plaintiff] should be entitled to an exemption under either (a) the facts for the base year and subject years are not materially different, or (b) the [Department] or court decision for the base year was erroneous (no evidence of the latter)." The court stated that it "cannot find another reasonable way of interpreting section 23-25(e)." However, "in an abundance of caution," the trial court did both: it conducted a comparison between the base year of 2012 and the subject years of 2004 through 2011, but it also conducted a *de novo* review of the entitlements for 2004 through 2011. As noted, the trial court found that "the outcome is the same under both analyses."

¶ 128　　　　We find that the proper analysis requires a "comparison" between the base and subject years because this approach follows the express language of section 23-25(e). We now examine the trial court's findings in its application of that standard.

¶ 129　　　　　　　　　b. Comparative Grounds Factor Analysis

¶ 130　　　　Defendants argue that the trial court erred in ruling that plaintiff satisfied section 15-86's substantive requirements. Specifically, they assert that (1) the court erroneously held that an exemption in one year could be established based on an exemption in another year and (2) plaintiff failed to show that it engaged in sufficient qualifying activity during the years 2004 through 2011.

¶ 131    On the first contention, defendants' criticism is defeated by the plain language of section 23-25(e), which allows a taxpayer to utilize a year in which an exemption was awarded to establish an exemption in a preceding or subsequent year so long as the grounds are comparable to the base year. 35 ILCS 200/23-25(e) (West 2022).

¶ 132    As to plaintiff's showing of sufficient qualifying activity, we examine the trial court's application of the section 15-86 factors. In doing so, we are mindful of several principles of law. Any statute granting tax exemptions must be strictly construed in favor of taxation. *Board of Certified Safety Professionals of the Americas, Inc. v. Johnson*, 112 Ill. 2d 542, 547 (1986). The burden of establishing entitlement to a tax exemption rests upon the taxpayer seeking it. *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 491 (1992). The party claiming an exemption carries the burden of proving clearly that the use of the subject property is within both the constitutional authorization and the terms of the statute under which the claim of exemption is made. *Oswald*, 2018 IL 122203, ¶ 18. This burden is by clear and convincing evidence. *Provena Covenant Medical Center*, 236 Ill. 2d at 388. Taxpayers may be required to demonstrate entitlement to an exemption each year even if there has been no change of circumstances. *Metropolitan Water Reclamation District of Greater Chicago v. Department of Revenue*, 313 Ill. App. 3d 469, 479-480 (2000).

¶ 133    In reviewing section 15-86, the trial court began by determining estimated property taxes as required by section 15-86(g)(1), (2), which provides the methodology for determining estimated property tax; those amounts are undisputed on appeal. The court then considered section 15-86(e)'s factors to determine the valuation of charitable services and activities. These factors include (1) charity care, (2) health services to low-income and underserved individuals, (3) subsidy of state or local governments, (4) support for state health care programs for

low-income individuals, (5) dual-eligible subsidy, (6) relief of the burden of government related to health care of low-income individuals, and (7) any other activity by the relevant hospital entity that the Department determines relieves the burden of government or addresses the health of low-income or underserved individuals. 35 ILCS 200/15-86(e)(1)-(7) (West 2022).

¶ 134    After thoroughly examining each of the factors under section 15-86, the trial court concluded that plaintiff had not only satisfied the standard for each year but that the expenses and activities conducted by plaintiff during the 2005 through 2011 subject years were comparable to those supporting plaintiff's exemption allowed in 2012:

> "The court has conducted a *de novo* review of the tax years 2004-2011 as well as conducted a comparison between these years and 2012. Under both analyses, the court finds that plaintiff has met its burden of proof for exemptions for the four parcels for 2004-2011. In each of the years, 2004-2011, the amounts listed for Community Care and services far exceed the amount of estimated or actual taxes paid. Defendants cannot credibly argue that plaintiff did not meet the statutory criteria for exemptions for years 2004-2011 in terms of charity versus estimated taxes.

> Whether this court is conducting a *de novo* review of the 2004-2011 or comparing those years to 2012, there is simply no way that any reasonable trier of fact could conclude otherwise than plaintiff has met the criteria for property tax exemptions under section 15-86 for the four parcels for 2004-2011."

¶ 135    In reaching its decision as to section 15-86 compliance, the court found plaintiff's expert Kevin Cornish credible. Cornish opined that plaintiff should qualify for property tax exemptions and provided five bases for his opinion: (1) plaintiff provided medical care to anyone

- 34 -

who wanted care regardless of ability to pay; (2) it extended significant effort and resources to promote the Community Care charity program and to remove obstacles for people to participate; (3) there was no capital stock or any shareholders; (4) there was no gain or profit to any private person, and plaintiff paid reasonable compensation; and (5) there were no dividends, and plaintiff reinvested net income into its operations. The court found it significant that Cornish "had extensive experience in the healthcare field" and that he had "worked with hospitals in the past" on section 15-86 applications. The court found defendants' expert, Mark Hall, who opined that plaintiff was not entitled to a charitable tax exemption, less credible; the court felt that Hall's theories on what constitutes a charitable use were "not the law of any jurisdiction" and that his "opinions suggest he was, in fact, relying on his unique ideas when coming to his opinions." Hall also had admitted his theory was "an economic ivory tower theory."

¶ 136    Much of defendants' opposition to the trial court's factual findings amounts to a request that we reweigh the evidence based on what defendants believe to be more significant. As we noted, the trial court's factual findings are subject to review under a manifest weight of the evidence standard. *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 15 (1993). The trial court weighed the evidence, considered witness credibility, considered multiple statutory factors, and acknowledged that the standards were to be applied on a case-by-case basis. The trial court provided ample support for its conclusions, and we will not disturb those conclusions absent a showing that an opposite result is clearly apparent. *Id.* (citing *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 192-93 (1989)).

¶ 137    For example, as part of its claim that the trial court's findings are against the manifest weight of the evidence, the Department argues that the court erroneously included an additional $32 million in "charges foregone" in its July through December 2010 calculations.

According to the Department, "[c]harity care under section 15-86 is 'measured at cost,' not charges foregone." While the Department is correct that "charity care" under section 15-86(e)(1) is defined as "[f]ree or discounted services provided to the relevant hospital entity's financial assistance policy, measured at cost," for the reasons below, we conclude the Department failed to demonstrate that the trial court's finding on this point was against the manifest weight of the evidence.

¶ 138     First, the 2010 charity care numbers—excluding the noted $32 million—were nonetheless over $9 million, which was greater than the years 2004 through 2009. Second, the court found that "[t]he Community Benefits Plan Reports *** state[d] that these charity care numbers do not include bad debt and are based on the actual cost of services." And third, the trial court rejected the defendants' contention that plaintiff's estimate of free and discounted care "could include bad debt," noting that "the forms indicate they do not."

¶ 139     Finally, it is equally apparent the court considered other factors beyond charity care in assessing compliance with section 15-86(e)(1) through (6). For 2010, the court observed that plaintiff and Carle Clinic Association Physician's Group (CCA) "merged, becoming an integrated delivery system. This brought together a hospital, physician's group and an insurance provider to offer a coordinate[d] network of services." The court concluded that, because plaintiff "acquired [CCA], which did not have a charity policy, [plaintiff] was now able to grant financial assistance not just for hospital services but also for doctor's visits and outpatient procedures."

¶ 140     Additionally, defendants argue that plaintiff's 2010 merger with CCA negatively impacted the section 15-86 charitable use analysis. As the trial court observed, this merger created "an integrated delivery system" that "brought together a hospital, a physician's group and an insurance provider to offer a coordinate[d] network of services." The court concluded that, because plaintiff acquired CCA, "which did not have a charity policy," it was "now able to grant financial

assistance not just for hospital services but also for doctor's visits and outpatient procedures." On this point, the court considered defendants' arguments regarding the merger, weighed them, and, in light of the evidence, concluded that the merger actually increased plaintiff's ability to provide charitable services to the community. We conclude the trial court's findings respecting the merger were not against the manifest weight of the evidence.

¶ 141       Consequently, we conclude that the trial court's findings that plaintiff has satisfied the requirements of section 15-86(c) regarding the four parcels for the years 2004 through 2011 are not against the manifest weight of the evidence.

¶ 142       7. *Compliance With Constitutional "Charitable Use" Requirements*

¶ 143       In addition to finding that plaintiff had satisfied the requirements of section 15-86(c), the trial court further concluded that plaintiff had likewise satisfied the constitutional requirements for "charitable use" set forth in article IX, section 6, of the Illinois Constitution of 1970, which provides, in part: "The General Assembly by law may exempt from taxation only *** property used exclusively for *** charitable purposes." Ill. Const. 1970. art. IX, § 6.

¶ 144       The supreme court has defined "charity" as " 'a gift to be applied *** for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare—or in some way reducing the burdens of government.' " *Provena*, 236 Ill. 2d at 390-91 (quoting *Korzen*, 39 Ill. 2d at156-57). Additionally, the term "exclusively used" is defined as "the primary purpose for which property is used and not any secondary or incidental purpose." *Korzen*, 39 Ill. 2d at 157; *Childrens Development Center, Inc. v. Olson*, 52 Ill. 2d 332, 336 (1972). Incidental acts of charity by an organization are not enough to establish that the use of the property is charitable. *Morton Temple Ass'n, Inc. v. Department of Revenue*, 158 Ill. App. 3d 794, 796 (1987). The supreme court has repeatedly acknowledged the difficulty of framing a

universally applicable definition of an exclusive charitable use. *People ex rel. Nordlund v. Ass'n of the Winnebago Home for the Aged*, 40 Ill. 2d 91, 100 (1968); *Korzen*, 39 Ill. 2d at 156. However, the above-stated "principles constitute the frame of reference to which we must apply plaintiff's use of its property to arrive at a determination of whether or not such use is in fact exclusively for charitable purposes." *Korzen*, 39 Ill. 2d at 157.

¶ 145　　　In *Oswald*, the supreme court held that a hospital taxpayer seeking a charitable use exemption must satisfy both section 15-86 and article IX, section 6. *Oswald*, 2018 IL 122203, ¶ 39. The court has identified five factors, commonly referred to as the *Korzen* factors, as a means of satisfying the constitutional requirements of article IX, section 6: (1) the benefits derived are for an indefinite number of persons for their general welfare or in some way reducing the burdens on government; (2) the organization has no capital, capital stock, or shareholders and earns no profits or dividends; (3) funds are derived mainly from private and public charity and are held in trust for the objects and purposes expressed in its charter; (4) it dispenses charity to all who need it and apply for it, and it does not provide gain or profit in a private sense to any person connected with it; and (5) it does not appear to place any obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses. *Korzen*, 39 Ill. 2d at 156-57.

¶ 146　　　The *Korzen* factors are guidelines, not strict requirements, that courts consider and balance by examining the facts of each case. *American Academy of Pediatrics v. Department of Revenue*, 2023 IL App (2d) 210718, ¶ 73 (citing *Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 469 (1995)).

¶ 147　　　We are aware that, in holding that a taxpayer seeking to establish a charitable exemption must satisfy both section 15-86 and the constitutional requirements, the *Oswald* court

mentioned only two of *Korzen*'s factors: those dealing with charitable *use*. It did not address factors dealing with charitable *ownership*:

"One category of property that the legislature may exempt from taxation is property used for charitable purposes. 'Charitable use is a constitutional requirement. An applicant for a charitable-use property tax exemption must "comply unequivocally with the constitutional requirement of exclusive charitable use." [Citation.]' *** [Citation.] In [*Korzen*], this court defined 'charity' as ' "a gift to be applied *** for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare-or in some way reducing the burdens of government." ' " (Emphasis omitted.) *Oswald*, 2018 IL 122203, ¶ 15 (quoting *Provena*, 236 Ill. 2d at 390-91, quoting *Korzen*, 39 Ill. 2d at 156-57).

Moreover, the *Oswald* court stated:

"This court has repeatedly acknowledged the difficulty of framing a universally applicable definition of an exclusive charitable use. [Citations.] However, the above-stated 'principles constitute the frame of reference to which we must apply plaintiff's use of its property to arrive at a determination of whether or not such use is in fact exclusively for charitable purposes.' " *Id.* ¶ 17 (quoting *Korzen*, 39 Ill. 2d at 157).

¶ 148          As can be seen, there is no mention of the *Korzen* factors that bear on whether the taxpayer is a "charitable institution." Indeed, interpreting *Oswald* to limit *Korzen*'s factors to only those relating to "charitable use" when reviewing a hospital's exemption claim in conjunction with section 15-86 is harmonious with article IX, section 6, which speaks only of "charitable use" and

- 39 -

not of "charitable institution." Certainly, the statutory ownership considerations embedded in section 15-86 inherently overlap with *Korzen*'s ownership factors (though a constitutional test cannot be altered by statute). Still, because the supreme court has not explicitly limited the *Korzen* factors, we conclude that the trial court properly considered all of them.

¶ 149    Defendants contest each of the trial court's *Korzen* findings, contending *inter alia* that charity was merely incidental rather than exclusive, that many activities took place on parcels other than the four at issue, that plaintiff primarily used the parcels for profit, that plaintiff limited who could receive its charity care or placed obstacles in the way of all who needed it, and that the amount of charitable activities is questionable. Although defendants point to contrary evidence and alternative inferences, neither is sufficient to satisfy their burden under the manifest weight of the evidence standard. "[A] verdict is not contrary to the manifest weight of the evidence when it hinges upon inferences which may have been drawn from the evidence." *West v. City of Hoopeston*, 146 Ill. App. 3d 538, 543 (1986).

¶ 150    The trial court went through each of the *Korzen* factors and concluded that, on the whole, they favored plaintiff. For example, the court found that plaintiff had no shareholders, that no person had invested capital in plaintiff's operations, and that no capital stock has ever been issued to anyone. Plaintiff never issued any dividends. Although plaintiff earned profits—ranging from $14.2 million in fiscal year 2005 to $128.9 million in fiscal year 2010—it was "undisputed that the profits were reinvested into technology, infrastructure and the like." While plaintiff did not rely on donations from the public or private charitable sources for its funding, the evidence at trial suggests that no hospital in Illinois received most of its revenue from such donations. Even defendants' expert Hall conceded that he did not know of any such entities, except perhaps the Shriner's Children's Hospital. Given these findings, the trial court concluded there was no material

difference between how plaintiff complied with this factor in 2012 versus any other year from 2004 through 2011.

¶ 151    The court further found that plaintiff dispensed charity to all who applied for and needed it. In so concluding, the court observed that plaintiff's articles of incorporation, bylaws, and mission statements "have provided that they care for anyone, at all times, without regard to ability to pay." Similarly, the court found there is no cap placed on the number of people that plaintiff could serve nor any limits on the number of people who could apply for and receive free or discounted care.

¶ 152    The court found plaintiff placed no obstacles in the way of those who needed and would avail themselves of the hospital's charitable benefits. Rather, plaintiff "took all reasonable steps to find those who could not pay and assist them in applying for government assistance and/or Community Care." Indeed, plaintiff's expert Cornish stated that plaintiff's efforts to promote charity care from 2004 through 2011 were unique and effective.

¶ 153    Additionally, the court found that plaintiff did not provide gain or profit in a private sense to any person connected with it. The court considered that the board of trustees was unpaid and that plaintiff's officers were paid reasonable fair market compensation. Defendants' expert Hall agreed that physician contracts were appropriate and paid at fair market value.

¶ 154    Lastly, the court concluded that plaintiff's actions relieved some of the burden on the government. This factor, the court observed, was well recognized in the case law, specifically *People ex rel. Carr v. Alpha Pi of the Phi Kappa Sigma Educational Ass'n of the University of Chicago*, 326 Ill. 573 (1927), and *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118 (1936). We further note that this factor was more recently commented upon favorably in *Provena*, 236 Ill. 2d at 398. Here, the trial court outlined numerous activities that plaintiff engaged in on the

four parcels that lessened the financial burden of the government, including the following: it was a level 1 trauma center, a level 3 perinatal center, and a primary stroke center; it created a mobile clinic for immunization and school physicals; it established a parish nurse program; and it provided many services at a loss, such as geriatric services, emergency room services, low vision center, an airlift, an auxiliary guesthouse, a breastfeeding clinic, palliative care, and the St. Joseph Institute for the Deaf. "The fact is that if [plaintiff] did not provide for some of these services, the burden would fall on the government or individuals."

¶ 155    The court stressed that, under *Korzen*, it was to consider the totality of the evidence and factors. Although the court found the *Korzen* factors dealing with deriving funds mainly from private and public favored defendants, all other *Korzen* factors favored plaintiff. "The court finds that, above the Community Care dollars spent, plaintiff has provided millions of dollars' worth of services, programs and grants to the community, much of it on the main campus." Accordingly, the court concluded that plaintiff had met its burden of proof entitling it to tax exemptions on the four parcels from 2005 through 2011.

¶ 156    As it had done with respect to its analysis of the section 15-86 factors, the trial court emphasized plaintiff's "Community Care" program that provides free and discounted care to low-income persons. Although tweaked from time to time, its basic components and philosophy have remained the same from 2004 through 2012. The court found the Community Care program to be "impressive[,] *** unique and beneficial to the public," and noted that it contained numerous features that made it more generous than other hospitals' charity programs.

¶ 157    We find ample support for the trial court's findings contained in the extensive record. It is the province of the trier of fact to weigh the evidence, resolve conflicts in the testimony, and assess the credibility of the witnesses. *People v. Evans*, 209 Ill. 2d 194, 209-10 (2004). "A

reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence." *Tate v. Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)). We cannot say that the trial court's factual findings respecting plaintiff's compliance with constitutional standards are against the manifest weight of the evidence.

¶ 158    Continuing its constitutional charitable use analysis, the trial court also rejected the assertion that the charitable activities must be broken down parcel by parcel. Here, the county defendants relied on a statement in *Oswald* that a hospital must show that the "subject property" meets the constitutional requirements of exclusive use. We have found no case that has required a specific parcel-by-parcel breakdown of interrelated parcels.

¶ 159    In any event, the record amply supports a finding that plaintiff undertook significant charitable activities on all parcels in this litigation. The trial court observed:

> "The evidence showed [that plaintiff] used portions of the four parcels for which it seeks exemptions exclusively for the operations of the hospital. The Main Hospital and North Tower properties are core aspects of the Urbana campus. [Plaintiff's] activities on those properties, include, to a great extent, medical care at free or discounted rates. [It] also provided important, money-losing healthcare services that benefit the entire community, conducting medical research, providing medical education and providing healthcare to all regardless of ability to pay."

The court continued:

> "Community Care provides free or discounted medical care, specifically at the Hospital, one of the parcels at issue. This is where medical research is done. This is where education of doctors, nurses and others take place. Thousands of

seminars take place in [plaintiff's] educational space, much of it is free and for the public. The planning for activities outside the Hospital are done in administrative offices at the Hospital [which are on the main and north tower parcels]."

¶ 160    As to the remaining parcels—the power plant and the daycare center—the court found they were both "reasonably necessary to accomplish the charitable purposes of the Hospital." We conclude the trial court's findings are not against the manifest weight of the evidence.

¶ 161    We also find the trial court's conclusion that plaintiff established a valid basis for partial exemptions for the four parcels, again made as part of its constitutional analysis, was not against the manifest weight of the evidence. Illinois law is clear that "there is no requirement that the entire property be used primarily for charitable purposes." *Highland Park Hospital v. Department of Revenue*, 155 Ill. App. 3d 272, 278 (1987). Indeed, this is expressly stated in section 15-86(c): "[i]f a parcel has both exempt and non-exempt uses, an exemption may be granted for the qualifying portion of that parcel." 35 ILCS 200/15-86(c) (West 2022). Moreover, if a property is "reasonably necessary" for accomplishing the charitable purpose, it qualifies for an exemption. *Northwestern Memorial Foundation v. Johnson*, 141 Ill. App. 3d 309, 312 (1986).

¶ 162    We note that the trial court remarked that defendants did not "loudly contest" the partial exemptions. We further note that neither the Department nor the township defendants contested the issue at all; conversely, the arguments of the county defendants are largely countered by the supreme court's holding in *Streeterville Corp. v. Department of Revenue*, 186 Ill. 2d 534, 537 (1999), which upheld a partial exemption for a parking lot that served both employees and members of the general public based on evidence of use. In reliance on *Streeterville*, we reject defendants' position.

¶ 163    Again, the trial court offered considerable factual findings to support its conclusion that each of the four parcels was entitled to some level of partial exemption. For example, the court concluded that "[t]he Caring Place is a daycare facility that serves [plaintiff's] employees *** as well as children in the community." Relying on *Memorial Child Care v. Department of Revenue*, 238 Ill. App. 3d 985, 993 (1992), which held that a hospital is entitled to an exemption for a childcare facility, the trial court concluded the Caring Place to be "reasonably necessary" to plaintiff to accomplish its charitable purpose. According to *Memorial Child Care*:

> "the availability of secure, flexible child care is more than a mere convenience; it is a necessity that directly affects an employee's willingness and ability to provide much needed services to Memorial Medical Center and the community. Child Care's use of the property is primarily for purposes reasonably necessary to accomplish the efficient administration of the hospital, and therefore the three parcels should be exempt from property taxation pursuant to section 19.7 of the Act." *Id.*

¶ 164    A partial exemption was likewise approved for the parcel containing the power plant because it provided "services to the entire Urbana campus." The court observed that plaintiff "could not operate without the Power Plant" and that it was "reasonably necessary" to accomplish plaintiff's charitable purpose. See, *e.g.*, *id.* at 989-90. Finally, the main campus and north tower parcels were supported by exhibits demonstrating the square footage of exempt and nonexempt use.

¶ 165    We find the trial court's award of partial exemptions was not against the manifest weight of the evidence.

¶ 166                              B. The Cross-Appeal

- 45 -

¶ 167                                    1. *Prejudgment Interest*

¶ 168          Generally, prejudgment interest is recoverable only where it is allowed by statute or agreement of the parties. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 255 (2006); *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576 (1980); *Neubert v. Foxworthy*, 71 Ill. App. 3d 438, 440 (1979). Where our review of a prejudgment interest order involves statutory interpretation, our standard of review is *de novo*. *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 672 (2004).

¶ 169                                    a. Statutory Interest

¶ 170          In claiming statutory interest, plaintiff relies on section 23-20 of the Property Tax Code. However, we start our analysis by widening our focus to the nature of that entire section of the statute, article 23, "Procedures and Adjudication for Tax Objections." 35 ILCS 200/art. 23 (West 2022). The first provision of article 23, section 23-5, begins by discussing the process for tax protests, a process it declares applicable "for any reason *other than that the property is exempt from taxation*." (Emphasis added.) *Id.* § 23-5. Section 23-15 (which describes the procedures for tax objection cases) provides for the payment of interest in the event a court orders a refund (*id.* § 23-15); in doing so, section 23-15(c) references section 23-20, stating, "[i]f the court orders a refund of any part of the taxes paid, it shall also order the payment of interest as provided in Section 23-20." *Id.* § 23-15(c).

¶ 171          Section 23-25 again explicitly provides that "[n]o taxpayer may file an objection as provided in Section 21-175 or Section 23-10 on the grounds that the property is exempt from taxation," except in circumstances not relevant here. *Id.* §§ 23-25, 21-175, 23-10. It allows for the existence of judicial proceedings to reestablish an exemption based on the "comparable grounds" analysis, but while this judicial process is permitted, those proceedings are not themselves

undertaken pursuant to article 23. Indeed, this conclusion is apparent from a plain reading of *Carle I*, where this court observed:

> "Subsection (e) of section 23-25 (35 ILCS 200/23-25(e) (West 2006)) does not purport to create a new cause of action out of whole cloth. It merely lifts the limitation that subsection (a) (35 ILCS 200/23-25(a) (West 2006)) imposes (or, more precisely, lifts the limitation if the conditions in subsection (e) are fulfilled). The 'cause of action, not otherwise specifically provided for by the *** Code' must exist in the law." *Carle I*, 396 Ill. App. 3d at 339-340.

¶ 172    As previously noted, *Carle I* concluded that section 23-25(e) effectively " 'revives the traditional suit in equity for injunction as one of the primary means of establishing a claim for exemption, provided that the Department *** (or a court on review) has acted favorably on a comparable claim for any other year. [Citation.]" *Id.* at 340. Thus, section 23-25(e) is one of several additional judicial remedies that exist outside the scope of article 23's statutory tax objection procedures. The foregoing reading of article 23 *in toto* reveals a clear intention by the legislature to exclude cases of exemption from the scope of its applicability. Article 23 is confined to tax objections and carefully excludes actions to establish or recover an exemption.

¶ 173    The interest provision specifically relied on by plaintiff, section 23-20, explicitly labels itself as addressing the "[e]ffect of protested payments" and recovery of refunds. 35 ILCS 200/23-20 (West 2022). We are aware of the admonishment in section 32-15 of the Property Tax Code's admonition that "[t]he language contained in the Titles, Articles, Captions, and Section and subsection headings in this Code: *** (c) shall not be used in construing the meaning of the substantive provisions of this Code," as they are "intended only as a general description that is not a part of the substantive provisions of this Code." *Id.* § 32-15(a), (c). Still, we observe that, in

multiple places, section 23-20 refers specifically to matters pertaining to protests. *Id.* § 23-20. Although not every sentence—including the specific sentence regarding interest—mentions tax protests, it is impossible to miss the overarching theme: article 23, including section 23-20, applies to cases of tax protests, not proceedings to establish or reestablish exemptions. We agree that plaintiff was not required to file a tax protest, and in all likelihood it would have been an empty act to file one; it would not have changed the meaning of the statute or placed plaintiff's action with the ambit of article 23.

¶ 174        In further support for our conclusion, we note that neither statutory provision relating to refunds in an administrative exemption proceeding allows for interest on a refund. See, *e.g.*, *id.* §§ 16-70, 16-130 (counties less than 3 million inhabitants; counties with more than 3 million inhabitants). Both statutory sections state that, if the property is determined to be exempt, "any taxes ***, if paid, shall be refunded." *Id.* §§ 16-70, 16-130. Interest is not provided for. Similarly, neither section 8-35 (governing review of a board of review decision before the Department) nor section 8-40 (governing administrative review of the Department's decision) provides for interest on a refund. Finally, section 16-185, which governs decisions of the Property Tax Appeal Board (PTAB), allows for interest only in cases where a *tax assessment* review is altered by the PTAB; that section does not apply to exemption determination reviews. *United Methodist Village Retirement Communities, Inc. v. Property Tax Appeal Board*, 321 Ill. App. 3d 456, 461-462 (2001). We discern no legislative intent to allow recovery of interest in a judicial proceeding when it is not allowed in an administrative proceeding.

¶ 175        Plaintiff argues that *Evangelical Hospital Ass'n v. Novak*, 125 Ill. App. 3d 439 (1984), a tax injunction case seeking an exemption where the court awarded interest on a refund, applies to this case. Plaintiff relies on *Carle I*'s language stating that section 23-25(e) revived "the

traditional suit in equity for injunction." (Internal quotation marks omitted.) *Carle I*, 396 Ill. App. 3d at 340.

¶ 176　　　　*Evangelical Hospital Association* explicitly denied payment of a refund for any tax year where taxes were not paid under protest until after the statutory provision at issue was in effect—and we note that the taxes at issue here were *never* paid under protest. We agree with *Evangelical Hospital Association*'s focus on the specific statutory language relied upon in a claim for interest. However, *Evangelical Hospital Association* provides an unsatisfying look at the entire statutory scheme. Perhaps because the statutory scheme has changed since it was decided, *Evangelical Hospital Association* fails to examine the central question: whether an *exemption* is to be treated the same as tax objections insofar as recovery of interest is concerned. Our conclusion, above, is that the provision for interest is contained in an article of the Property Tax Code that expressly excludes the provision for payment of interest. To the extent *Evangelical Hospital Association* reaches a contrary conclusion, we decline to follow it.

¶ 177　　　　For these reasons, we conclude that section 23-20 does not allow interest on the refund awarded in the instant case. By its plain language, section 23-20 is applicable only to refunds paid in protest tax objection cases, and section 23-5's provision for payment of taxes under protest expressly excludes objections due to the property being "exempt from taxation." 35 ILCS 200/23-5, 23-20 (West 2022).

¶ 178　　　　　　　　　　　　b. Equitable Considerations

¶ 179　　　　We further find that the supreme court's decision in *Shell Oil Co. v. Department of Revenue*, 95 Ill. 2d 541 (1983), does not support the imposition of interest here. The supreme court began its discussion in *Shell Oil* by noting that "[i]nterest is not normally recoverable, in the absence of a statute or an agreement providing for it." *Id.* at 546. The court went on to state,

however, that "[e]ven in the absence of statutory authorization, a court may award interest in a proceeding against the State if equitable considerations warrant it, as long as the effect of doing so does not constitute the entering of a money judgment against the State." *Id.* at 547. The court awarded interest in *Shell Oil* because the taxes at issue were being held in a defined protest fund, so the award of interest did not require a judgment against the State to permit the taxpayer to recover the interest earned.

¶ 180 If *Shell Oil* applies here, as plaintiff argues it does, then all of it must apply; thus, the court below should not have awarded interest unless there were a discrete and identified protest fund from which plaintiff's interest award could be paid, as opposed to entering a money judgment against defendants. While there is evidence that funds in some amount were put aside, there is no clear evidence that the funds are sufficient to cover both the refund of taxes and interest thereon. For plaintiff to receive interest here, a money judgment would have to be awarded against the defendants. While there are certainly sovereignty considerations that apply to the State that may not apply to local units of government, entering a money judgment against defendants would stretch equitable considerations thin in the face of a contrary statute. Even if there is a statutory basis for prejudgment interest, the decision whether to award prejudgment interest is one of trial court discretion. *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 119. We conclude that it was not an abuse of discretion for the trial court to decline to award plaintiff interest on some 15 years' worth of tax payments.

¶ 181 2. *Rulings on Count I—Claim of Unauthorized Assessment of Exempt Properties*

¶ 182 Finally, plaintiff cross-appeals from the trial court's December 2018 order granting summary judgment in favor of certain county defendants on count I of the fourth amended complaint, which sought relief based on the allegedly wrongful assessment by local taxing officials

of property exempt from taxation. According to the trial court, when the overall scheme of the Property Tax Code and the facts of this case are considered, "the [county defendants] had the authority to assess [p]laintiff's properties." However, plaintiff argues local governmental officials are allowed to assess only nonexempt property per section 9-70 of the Property Tax Code, which states, in part, that "[l]ocal assessment officers shall assess all other property *not exempted from taxation*." (Emphasis added.) 35 ILCS 200/9-70 (West 2022).

¶ 183    *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 297 (2010), establishes that "section 9-70 specifically precludes the assessor from assessing such exempt property." Except in limited circumstances not present here (see, *e.g.*, 35 ILCS 200/9-95, 13-10, 15-25 (West 2022) (each provision empowers the Department to order a reassessment of exempt property); *id.* § 15-10(a) (regarding requirements for an affidavit from the property owner)), local authorities are precluded from assessing an exempt parcel. Illinois law is well settled that "public officials have no taxing power except that which is delegated to them by the legislature" (*Millennium Park Joint Venture*, 241 Ill. 2d at 295), and section 9-70 does not permit local assessment of exempt property.

¶ 184    As noted by the Department, local taxing authorities have a statutory right to *correct errors* in assessments. Section 9-75 specifically authorizes the "assessor of any township" in a county of less than 3 million inhabitants to "revise and correct an assessment as appears to be just." 35 ILCS 200/9-75 (West 2022). Section 9-80 likewise gives this same power to the chief assessment officer of each county with more than 3 million inhabitants. *Id.* § 9-80. However, the authority to correct erroneous assessments of nonexempt property does not include the authority to make taxable that which was previously exempt. Such a change would represent not merely a correction to valuation but a change in taxable status.

¶ 185        Confusion may arise in this context when dealing with properties that are *partially* exempt. It is necessary that local officials have the ability to assess the nonexempt portion of the property or correct an erroneous prior assessment to ensure that the nonexempt property is taxed appropriately. See, *e.g.*, *Uretsky v. Baschen*, 47 Ill. App. 3d 169, 174 (1977) ("[I]t is apparent that the assessment officials have the power and the duty to inspect real property within their jurisdiction annually for the purpose of making certain changes and revisions."). Where a partial exemption is expressed in terms of some percentage of the whole value of the property (see, *e.g.*, *Streeterville Corp.*, 186 Ill. 2d at 538 (74% of its parking lot spaces were used for exempt purposes)), it is inescapable that the local officials must *measure* the value of the entire property in order to proportionally value the taxable portion of it. But measurement of the entire value is not the same as imposing an assessment, *i.e.*, a tax, on the full value of the real estate; doing so is impermissible with respect to the exempt portion of the property.

¶ 186        Here, there is no dispute that the four parcels were fully or partially exempt from taxation prior to 2004. The north tower parcel had previously been 100% exempt, while the main campus and power plant parcels were partially exempt; all three parcels had undergone new construction when they were reassessed in 2004. The fourth property—containing the childcare facility—was also partially exempt.

¶ 187        Cunningham Township Assessor Joanne Chester's assessment of the three parcels in 2004 resulted from her belief, after purportedly speaking with someone at the Department, that she had incorrectly assessed the parcels by not considering the new construction. She acknowledged that she did not have the authority to assess exempt property, but she believed that her acts here were authorized because she "had failed to list new construction on those three parcels so that the [Department] could make a determination as to a percentage exemption." Chester said

that because she "had never valued part of the new construction that had occurred, the percentage exemption that was listed on the property card *** did not reflect the full market value of the property with the new construction." She further said, "I had failed to put a value on new construction on the north tower, on additions to the main property and to the power plant when they were built." She did not reassess plaintiff's other properties because "[t]hey had not had new construction on them after they received their exemption." Chester said she did not terminate the exemptions and that she had advised plaintiff to reapply for exemptions going forward.

¶ 188        It is immaterial whether exempt property is valued appropriately; the value determination is relevant only to the payment of the applicable tax. Had the local assessor continued to apply the existing partial exemptions to the revalued properties, then the nonexempt portions could have been revalued without affecting the exempt portion. Indeed, section 9-75 allows a local assessor to revalue a partially exempt parcel following new construction, but in doing so the local assessor must respect the prior exemption—whether stated as a dollar value or in percentage terms. Because of the failure to proceed in this manner, plaintiff here was forced to file new applications to reestablish the exemptions. Regardless of whether Chester intended to facilitate a revaluation of only the taxable portion of the property, her assessment of the properties at their full value caused tax bills to be issued without reference to the partial exemptions; in other words, she effectively terminated the partial exemptions. Under Illinois law, the local assessor has no *sua sponte* authority to unravel the previously awarded exemptions (see *infra* ¶ 185); that authority rested with the board of review or the Department. 35 ILCS 200/16-70, 8-35(b) (West 2022). Chester herself acknowledged that she lacked the authority to terminate the preexisting exemptions.

¶ 189    As to the fourth property—the childcare facility—Chester's assessment had nothing to do with the need for plaintiff to pursue continued exemptions. As stated in the county defendants' response to the first set of interrogatories, the charitable exemption for the childcare facility was first recognized for the 1987 tax year based upon a November 1993 ruling by the Champaign County circuit court. "This exemption was then allowed to vary annually based upon enrollment in the day care center on the parcel by [p]laintiff's employees." The interrogatory answers further explained:

> "Rather than assess the parcel as exempted each year, the Supervisor of Assessments at that time and [p]laintiff agreed that the parcel would be taxed at its full (non-exempt) amount and then granted a certificate of error at the end of the tax year, reflecting the amount of a partial exemption corresponding with the enrollment by [p]laintiff's employees in the day care."

¶ 190    The supervisor of assessments discontinued this practice in September 2004 because he determined that "neither [his] office nor the Champaign County Board of Review ha[d] the authority to apply a partial exemption" for the childcare facility parcel and, as a result, the exemption expired at some point prior to 2004. According to a September 2004 letter from the Champaign County chief assessment officer to plaintiff, "although [s]uch a partial exemption may have been allowed in the past, *** it appears that partial exemptions are to be determined solely by the [Department]." See, *e.g.*, *United Methodist Village Retirement Communities, Inc.*, 321 Ill. App. 3d at 461 ("The Property Tax Code makes it clear that only the [Department] has authority to determine if a property is exempt from taxation."). In substance, the local officials had come up with an unconventional method of dealing with the partial exemptions by first ignoring the partial

exemption but then effectively reinstating it by issuing a certificate of error. The elimination of the second step in 2004, however, left only the first: total elimination of the exemption.

¶ 191        Defendants argue that, even if the local assessor lacked authority to eliminate the exemptions, the Department had such authority; consequently, they argue, the Department's decision to eliminate the exemptions going back to 2004 must still be given effect. In support of this argument, defendants rely on *Highland Park Women's Club v. Department of Revenue*, 206 Ill. App. 3d 447 (1990). The plaintiff there, a Lake County taxpayer, challenged exemptions that had been granted to the Highland Park Women's Club (Club) and the Ravinia Festival Association. The board of review recommended continuation of the exemptions, but the Department denied them. The circuit court upheld the exemptions but found the plaintiff lacked standing to bring his challenges against the Club.

¶ 192        On appeal, the appellate court also found that the plaintiff lacked standing. The defendants argued that the plaintiff's lack of standing required dismissal of the entire case, "even if the Board and Department [could] review exemptions *sua sponte*." *Id.* at 462. The appellate court disagreed, concluding, "[e]ven if the Board and Department reviewed the exemptions in question under the mistaken belief that they were required to do so because of [plaintiff's] complaint, the determinative factor, in our view, is that both had the authority to review the exemptions under the Act." *Id.* In other words, a party without the power to raise the issue still managed to get it in front of the authorities who could address it *sua sponte. Highland Park* takes, in essence, a "no harm, no foul" approach: even if the suit was invalidly initiated, it prompted someone with authority to act.

¶ 193        Defendants here rely on *Highland Park Women's Club* to argue that the 2004 change in assessment eventually got the matter in front of the board of review and the Department,

and each possessed the power to eliminate the exemption *sua sponte*. The critical distinguishing factor between this case and *Highland Park* is that the unauthorized actions of the local officials in 2004 could not have triggered the board of review and the Department to review the exemptions *as to the 2004 tax year.* According to section 15-25 of the Property Tax Code, even assuming the exemption matter was properly before the board of review in 2004, the properties would not have been returned to the assessment rolls until the next assessment year, 2005. 35 ILCS 200/15-25 (West 2022). Section 15-25 states that, "[i]f the Department determines that any property *** *is no longer entitled to exemption*, the Department shall, before January 1 of any year, direct the chief county assessment officer to assess the property and return it to the assessment rolls for the *next assessment year.*" (Emphasis added.) *Id.* Given this clear statutory language, the 2004 exemptions could not have been terminated or removed until later. To remove the 2004 exemptions, the board of review would have to have acted in 2003. Consequently, *Highland Park*'s "no harm, no foul" approach does not cure the local officials' lack of authority here with respect to the 2004 tax year at issue.

¶ 194     As a result, the trial court erred in entering summary judgment in favor of defendants regarding the three parcels with new construction for 2004. Accordingly, we reverse the entry of summary judgment for defendants on count I regarding the three parcels for 2004 and remand the matter to the trial court for the entry of a judgment in favor of plaintiff and for a refund of taxes as to the three parcels in 2004.

¶ 195     As to the childcare facility parcel, we conclude that the 2004 exemption should also be reinstated, but for a different reason. When discussing the percentage of exemptions on the various parcels, the trial court acknowledged that "[a] daycare facility can constitute an appropriate auxiliary use of an exempt hospital" (see, *e.g.*, *Memorial Child Care*, 238 Ill. App. 3d at 992-993

(a hospital is entitled to an exemption for a childcare facility)) and that the childcare facility here was "reasonably necessary to [plaintiff] to accomplish its charitable purpose." It further found that the previous partial exemption for the childcare parcel was properly based on the number of plaintiff's employees' children who used the facility and that this had been the practice prior to 2004 and "is an appropriate practice of the future." In other words, the childcare provided on that parcel was inextricably linked to the charitable use of the other parcels. Thus, if the three parcels were exempt (fully or partially) for charitable use in 2004, the childcare facility was too.

¶ 196    Given our conclusion that the three other parcels were entitled to their continued charitable use exempt status in 2004 and considering the trial court's findings that the childcare facility supported the plaintiff's charitable uses on those parcels both before and after 2004, we conclude that plaintiff was entitled to a partial charitable use exemption in 2004 for its childcare facility parcel. For these reasons, the trial court's order denying plaintiff's partial exemption for the childcare facility parcel for 2004 is reversed.

¶ 197    Therefore, we reverse the December 2018 order granting summary judgment for defendants on count I regarding all four parcels for 2004, remand the matter to the trial court for the entry of a judgment in favor of plaintiff, and order a refund of taxes as to those parcels in 2004. We need not further address the years 2005 through 2011 because we have affirmed the trial court's ruling as to those years.

¶ 198                                III. CONCLUSION

¶ 199    For the reasons stated above, we affirm the trial court's judgment awarding charitable use tax exemptions for 2005 through 2011 and denying prejudgment interest. We further reverse the entry of summary judgment for defendants on count I regarding the four parcels for 2004 and remand the matter to the trial court for the entry of a judgment in favor of plaintiff on

- 57 -

count I for 2004 and for a refund of taxes as to the four parcels in 2004 in accordance with the full or partial exemptions as applicable.

¶ 200  Affirmed in part, reversed in part; cause remanded.

¶ 201  Cause remanded.

*The Carle Foundation v. Department of Revenue*, 2023 IL App (4th) 200121

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 08-L-202; the Hon. Randall B. Rosenbaum, Judge, presiding. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Caleb Rush, Assistant Attorney General, of counsel), for appellants Department of Revenue and David Harris. |
| | Frederic M. Grosser, of Champaign, for appellants Cunningham Township, Wayne T. Williams Jr., and City of Urbana. |
| | Joel Fletcher, State's Attorney, of Urbana, for other appellants. |
| **Attorneys for Appellee:** | Steven F. Pflaum and Collette A. Woghiren, of Neal, Gerber & Eisenberg LLP, and Amy G. Doehring and Catherine A. Miller, of Akerman LLP, both of Chicago, for appellee. |
| *Amicus Curiae*: | Karen Harris, of Illinois Health and Hospital Association, of Naperville, and April E. Schweitzer, Thomas M. Fahey, Floyd D. Perkins, and Seth A. Horvath, of Nixon Peabody LLP, of Chicago, for *amicus curiae* Illinois Health and Hospital Association. |